IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 14–cv–03245–KMT

PHILLIP S. MANDRELL,

    Plaintiff,

v.

PHYSICIAN HEALTH PARTNERS AKA (PHP) CORRECTIONAL HEALTH PARTNERS,

    Defendant.

---

# ORDER

---

This case comes before the court on "Defendant's Motion for Summary Judgment" (Doc. No. 77 [Mot.], filed January 20, 2017). Plaintiff filed his response on February 13, 2017 (Doc. No. 83 [Resp.]), and Defendant filed its reply on February 27, 2017 (Doc. No. 84 [Reply]).

## STATEMENT OF THE CASE

Plaintiff, proceeding *pro se*, asserts claims for violations of his Eighth Amendment rights for the defendant's alleged failure to provide him proper medical care. (*See* Doc. No. 10 [Compl.], filed January 5, 2015). Plaintiff is an inmate in the Colorado Department of Corrections ("CDOC"). (*Id.* at 3.) He states in 2011, he was diagnosed with a stricture in his colon. (*Id.*) Plaintiff alleges gastrointestinal physicians at Denver Health Medical Center ("Denver Health") recommended that he undergo surgery to remove the stricture. (*Id.* at 3-4.) Plaintiff alleges the defendant denied approval for the surgery because Plaintiff was close to his mandatory release date ("MRD"). (*Id.* at 4.) Plaintiff alleges he suffered for an additional year

while his condition worsened and the stricture became a bowel blockage, at which time he underwent immediate surgery with removal of part of his colon. (*Id.* at 5-6.) Plaintiff alleges the defendant has a policy of either denying or approving surgery depending on the inmate's MRD, and that the policy violated his Plaintiff's Eighth Amendment rights. (*Id.* at 6.)

## UNDISPUTED FACTS

Defendant CHP ("CHP") is a Colorado corporation providing utilization management services for inmates incarcerated in the CDOC pursuant to an annual contract. (Mot., Ex. A [Mix Decl.], ¶ 2.) CHP is not a medical provider for CDOC inmates, but rather acts as an administrator, processing requests from CDOC medical providers to determine the medical necessity and propriety of requests for treatment outside of the CDOC's internal medical system. (*Id.*) CHP physicians review and approve requests for pre-authorizations for outside medical care. (*Id.*, ¶¶ 1, 3.)

CDOC inmates receive medical care within their correctional facilities from primary care providers, such as physicians, nurse practitioners or physician assistants. (*Id.*, ¶ 4.) Inmates also may be referred by primary care providers to specialists for outside medical care, but providers are required to obtain pre-authorization for outside services, such as surgical procedures, from CHP. (*Id.*, ¶¶ 4, 5.) Providers request pre-authorization by sending a request and supporting medical records to CHP. (*Id.*, ¶ 5.) When a CHP physician authorizes, or approves, a request, the authorization is entered into a computer system, and CDOC is electronically notified within 24 hours. (*Id.*, ¶ 6.) The authorization also can be reviewed by outside providers using the electronic system within 24 hours. (*Id.*) Neither CHP nor its physicians determine whether a request for a procedure is "urgent." (*Id.*, ¶ 7.) Rather, the provider making the request marks the

request as urgent or routine; the CHP physician determines only whether the requested procedure is medically necessary. (*Id.*) After entering the authorization into the computer system, CHP and its physicians have no responsibility for scheduling the approved procedure. (*Id.*, ¶ 8.) Scheduling is the responsibility of the CDOC and its health care providers. (*Id.*, ¶ 9.)

On April 15, 2011, a medical provider at Limon Correctional Facility ("LCF"), submitted a request for Plaintiff to receive a colonoscopy from Dr. James Miller. (Mot., Ex. B [Mandrell Dep.] at 29:19-25, 30:1-25, 31:1-12, Ex. 1.) CHP approved the request. (*See id.*) In July 2011, Dr. Miller performed the colonoscopy and determined Plaintiff had a "stricture" in his colon. (*Id.* at 28:22-25, 32:5-9.) On August 15, 2011, a medical provider at LCF requested CHP approve a procedure for a "radix colon barium enema" for Plaintiff at Denver Health. (*Id.* at 33:5-25, 34:1-5, Ex 3.) The barium enema procedure was approved by CHP (*see id.*) and occurred in September 2011 (*id.* at 32:23-25, 33:1, 34:6-10, Ex. 2). On September 21, 2011, a medical provider at LCF requested CHP's approval for Plaintiff, to receive an outpatient visit at Denver Health, which CHP approved. (*Id.* at 34:23-25, 35:1-23, Ex. 4.) On November 16, 2011, Plaintiff was seen at Denver Health as a follow-up to the colonoscopy and the barium enema. (*Id.* at 34:6-16, Ex. 2.) During the November 16, 2011 visit, it was determined Plaintiff's "descending colon [ ] has a stricture narrowing from 8 centimeters down to 1 centimeter." (*Id.* at 40:20-23, Ex. 2.) The medical providers at Denver Health recommended that Plaintiff receive a colonoscopy with a pediatric scope in an effort to be better able to pass the scope through the stricture. (*Id.* at 41:8-21, Ex. 2.) As of November 16, 2011, the medical providers at Denver Health were not recommending surgery. (*Id.* at 41:22-25, Ex. 2.) On November 22, 2011, medical providers from Denver Health requested CHP's approval for Plaintiff to have a follow-

up visit to Denver Health and a CT scan of his abdomen. (*Id.* at 42:8-25; 43:1-25, 44:1-25, 45:1-25, Exs. 5, 6.) The follow-up visit and the CT scan were approved. (*Id.* at 43:7-15, 45:13-25, Exs. 5, 6.) On January 5, 2012, Plaintiff received the CT scan of his abdomen, which indicated a "narrowing colon." (*Id.* at 46:2-25, 47:1-7, Ex. 7.) On February 2, 2012, Plaintiff was seen at Denver Health for a colonoscopy, though the procedure was aborted prior to completion due to Plaintiff's anxiety and the inability to sedate. (*Id.* at 48:7-25, 49:1-25, 50:1-24 Ex. 8.)

On May 3, 2012, a medical provider at Colorado Territorial Correctional Facility ("CTCF") requested CHP's approval to refer Plaintiff to Denver Health for three items: (1) endoscopy, (2) colonoscopy, and (3) "unclassified" drug administration. (*Id.* at 55:15-25, 56:1-25, 57:1-25, Ex. 9.) All three requests were approved by CHP. (*Id.* at 58:1-8, Ex. 9.) The colonoscopy was to be performed with a pediatric scope under stronger anesthesia to avoid the issues encountered in the previous colonoscopy. (*Id.* at 59:17-25, 60:1-24, Ex. 10.) On May 29, 2012, CTCF requested approval from CHP for Plaintiff's immediate transfer to St. Mary-Corwin Hospital for inpatient care related to an inflammation in his colon. (*Id.* at 61:15-25, 62:1-25, 63:1-25, Ex. 11.) CHP approved the request. (*Id.* at 64:1-7, Ex. 11.)

While at St. Mary-Corwin Hospital in late May 2012, Plaintiff received a colonoscopy and CT scan, which revealed the stricture. (*Id.* at 64:8-23.) On June 28, 2012, Dr. Susan Tiona at CTCF requested approval from CHP to refer Plaintiff to Dr. Camille Azar to receive another colonoscopy with "balloon dilation," which is when a balloon is inflated inside the colon to widen or expand a stricture. (*Id.* at 65:1-23, 66:14-25, 67:18-25, 68:1-3, Ex. 12.) CHP approved both requests. (*Id.* at 68:16-24, Ex. 12.) On or about August 30, 2012, Plaintiff went to see Dr. Azar for the colonoscopy and balloon dilation, but the balloon dilation procedure was not

4

successful. (*Id.* at 69:21-25, 70:1-25, 71:1-25, 72:1-12, Ex. 13; *see also id.* at 91:1-3.) While attempting the balloon dilation, it is believed Plaintiff's colon tore, which resulted in bleeding and repair using clips. (*See id.*)

On October 11, 2012, after Plaintiff had been transferred to Fremont Correctional Facility ("FCF"), Dr. Timothy Creany requested approval from CHP to refer Plaintiff to Dr. Atul Vahil, a gastroenterologist, for a consultation. (*Id.* at 76:18-25, 77:1-21, Ex. 14.) CHP approved Dr. Creany's request. (*Id.* at 77:22-25, 78:1-3, Ex. 14.) In October 2012, Plaintiff was seen by Dr. Vahil, who performed a colonoscopy on Plaintiff "at some point" and recommended Plaintiff be referred to Denver Health. (*Id.* at 81:23-25, 82:1-7.)

On November 19, 2012, after Plaintiff had been transferred to Sterling Correctional Facility ("SCF"), Dr. Maurice Fauvel requested CHP approve a request for Plaintiff to be seen at Denver Health, which was approved by CHP. (*Id.* at 82:16-25, 83:1-25, 84:1-5, Ex. 15.) Dr. Fauvel sent Plaintiff to Denver Health based on his recommendation Plaintiff be evaluated for a possible colectomy. (*Id.* at 84:10-15, Ex. 15.) The appointment was scheduled for January 16, 2013. (*Id.* at 88:10-23, Ex. 17.) At the January 16, 2013 appointment, the providers reviewed Plaintiff's colonoscopy results from Dr. Azar's colonoscopy on August 30, 2012, and ruled out cancer as a possible diagnosis. (*Id.* at 92:4-16, Ex. 17.) The providers recommended two surgical options for Plaintiff: (1) a total complete proctocolectomy with an end ileostomy and (2) a total colectomy with an ileorectal anastomosis. (*Id.* at 94:12-22, Ex. 18.) Plaintiff preferred not to have a colostomy bag permanently, so he and the physician decided in favor of the total colectomy with an ileorectal anastomosis and a possible diverting loop ileostomy. (*Id.* at 97:19-25, Ex. 18.) The physician informed Plaintiff that, before committing to surgery, he wanted to

5

confirm Plaintiff's diagnosis of ulcerative colitis, discuss Plaintiff's pathology results with a pathologist, and discuss Plaintiff's case with other gastroenterologists at Denver Health. (*Id.* at 98:21-25, 99:1-7, Ex. 18.)

On January 16, 2013, Plaintiff was "tentatively" scheduled for a laparoscopic total colectomy and ileorectal anastomosis with diverting loop ileostomy. (*Id.* at 99:8-15, Ex. 18.) On January 18, 2013, a medical provider at Denver Health requested approval from CHP for the surgical procedure recommended by Denver Health. (*Id.* at 99:17-25, 100:1-25, 101:1-3, Ex. 19). On January 24, 2013, CHP approved the surgical procedure. (*Id.* at 101:4-8, Ex. 19.) On February 12, 2013, Plaintiff was seen at Denver Health in follow-up to the January 16, 2013 appointment. (*Id.* at 101:11-25, 102:1-8, Ex. 20.) The medical provider at Denver Health informed Plaintiff that, after discussions with Plaintiff's gastroenterologist at St. Mary-Corwin Hospital, it was not clear Plaintiff had ulcerative colitis. (*Id.* at 102:9-13, Ex. 20.) On February 12, 2013, the medical provider at Denver Health canceled Plaintiff's scheduled surgery because he wanted Plaintiff to be seen by a gastroenterologist and receive another colonoscopy. (*Id.* at 102:14-21, Ex. 20.) As of February 12, 2013, the medical providers at Denver Health choose to hold-off on surgical intervention which demonstrated the recommended surgery was not emergent and was something that could wait. (*Id.* at 103:20-25, 104:1-8, Ex. 20.)

On February 22, 2013, a medical provider at Denver Health requested CHP's approval for Plaintiff to receive a follow-up appointment at Denver Health for "further workup by GI prior to surgery to determine if patient carries diagnosis of ulcerative colitis." (*Id.* at 104:11-25, 105:1-14, Ex. 21.) On March 1, 2013, CHP approved this request. (*Id.* at 105:15-20, Ex. 21.) On March 25, 2013, a medical provider at Denver Health requested CHP's approval for Plaintiff

6

to receive another colonoscopy under anesthesia. (*Id.* at 107:1-25, Ex. 22). On the request there is a notation Plaintiff had received a colonoscopy in August 2012. (*Id.* at 106:1-4, Ex. 22.) The request was marked as "routine." (*Id.* at Ex. 22.) On April 2, 2013, CHP denied the March 25, 2013 request for a colonoscopy, and on April 3, 2013, and on April 30 2013, CHP noted that the request "Remains denied. As per Dr. Mix given path[ology] provided and short MRD this procedure can reasonably be deferred until after release." (*Id.* at 108:9-25, 109:1-21, Ex. 22; *see also* Mix Decl., ¶ 12; Resp. at 12-13.) Based on the information provided to CHP by CDOC, Plaintiff's mandatory release date was August 21, 2013, which was about five months from when the colonoscopy was requested. (*Id.* at 109:19-25, 110:1-15; *id.* at ¶ 11.)

On May 22, 2013, Plaintiff was seen at Denver Health and the medical provider, after reviewing Plaintiff's chart, decided to move forward with surgery related to Plaintiff's colon, despite the denial of the colonoscopy procedure. (Mandrell Dep. at 112:18-25, 113:1-6, 114:17-25, 115:1-18, Ex. 23.) The recommended surgical procedure was a "laparoscopic total abdominal colectomy with J pouch anastomosis and protective ileostomy." (*Id.* at 114:17-25, 115:19-25, Ex. 23.) As of May 22, 2013, Plaintiff had been experiencing the same symptoms for nearly a year, no better or no worse, which were the same symptoms Plaintiff had been experiencing when the physicians at Denver Health decided to postpone surgical intervention. These symptoms included some abdominal pain, periodic diarrhea, and coffee ground stools every three to four days. (*Id.* at 116:11-25, 117:1-8, Ex. 23.) Plaintiff agreed to proceed with the surgery proposed to him on May 22, 2013. (*Id.* at 117:9-25, 118:1-5, Ex. 23.)

On May 28, 2013, Denver Health requested CHP's approval for a "laparoscopic possible open total abdominal colectomy with J point anastomosis and protective ileostomy." (*Id.* at

7

119:1-25, Ex. 24.)  This procedure was identified as "routine."  (*Id.* at Ex. 23.)  CHP denied the request for the surgical procedure on or about June 4, 2013, because Plaintiff's mandatory release date was believed to be August 21, 2013, and the surgery could be safely deferred until after Plaintiff's release.  (*Id.* at 120:1-9, Ex. 24; *see also* Mix Decl. at ¶ 14; Resp. at 16.)  On June 6, 2013, Joan B. Martin, M.D., a physician with the CDOC, appealed CHP's denial of the surgical procedure requested on May 28, 2013, and noted that the surgery was denied "due to a lack of adequate documentation" by the CDOC.  (Resp. at 18.)  On July 8, 2013, CDOC Nurse Practitioner Heather Skaggs also appealed CHP's denial of the surgical procedure requested on May 28, 2013, specifically advising that MRD previously provided by the CDOC and on which CHP was basing its evaluation was incorrect and that Plaintiff's MRD was actually December 20, 2015.  (*Id.* at 19.)

On July 24, 2013, Dr. Fauvel requested CHP approve an outpatient surgical consult for Plaintiff with Dr. Stovall at Denver Health.  (Mandrell Dep. at 123:12-15,124:1-29, 125:3-16, Ex. 25.)  CHP approved the July 24, 2013 request for the outpatient surgical consult on July 30, 2013.  (*Id.* at 125:17-19, Ex. 25.)  On August 22, 2013, after receiving Plaintiff's correct mandatory release date of December 20, 2015 from CDOC, CHP reversed its denial of the surgical procedure requested on Plaintiff's behalf on May 28, 2013.  (Mix Decl., ¶ 15, Attach. 3.) On September 24, 2013, CHP notified both Denver Health and the CDOC the denial of the May 28, 2013 request for the surgical procedure had been reversed and the surgery approved.  (*Id.*)

Pursuant to the request for surgical consultation approved on July 30, 2013, Plaintiff was seen at Denver Health on October 16, 2013, for reevaluation for surgery.  (Mandrell Dep. at 125:22-25, 126:1-19, Ex. 26.)  During the October 16, 2013 visit, Plaintiff and the Denver Health

8

medical provider discussed surgical options again, including "the option of a segmental colectomy of the strictured area" as opposed to total colectomy. (*Id.* at 127:9-25, 128:1-25, 129:1-25, 130:1-12, Ex. 26.) At the October 16, 2013 appointment, Plaintiff and the Denver Health medical providers agreed to proceed with surgical intervention. (*Id.* at 130:17-25, 131:1-8, Ex. 26.)

On October 25, 2013, a medical provider at Denver Health requested CHP's approval to perform laparoscopic "possible open colectomy, J pouch, and preventative ileostomy," which was the surgical intervention discussed at Plaintiff's October 16, 2013 appointment. (*Id.* at 131:11-25, 132:1-7, Ex. 27.) On October 29, 2013, CHP approved the surgical procedure requested by Denver Health on October 25, 2013. (*Id.* at 132:8-13, Ex. 27.) Plaintiff was approved for this operation to take place through and including April 24, 2014. (*Id.* at Ex. 27.)

On November 5, 2013, Dr. Fauvel at SCF, where Plaintiff resided, requested CHP's approval for Dr. Miller to perform a colonoscopy on Plaintiff. (*Id.* at 133:11-25, 134:1-13, Ex. 29.) On November 12, 2013, CHP approved the request for a colonoscopy. (*Id.* at 134:15-20, Ex. 29.) As of November 5, 2013, Dr. Fauvel reported Plaintiff was "on no meds currently for [ulcerative colitis]," was "eating well" and did not have blood in his stools. (*Id.* at 138:1-6, Ex. 29.) Plaintiff's symptoms were no worse than they had been a year prior. (*Id.* at 138:22-25, 139:1-4.) On April 23, 2014, Dr. Fauvel at SCF requested CHP's approval for Plaintiff to be seen at Denver Health following Plaintiff's recent bout with constipation, an ulcerative colitis "flare-up," and right lower quadrant abdominal pain. (*Id.* at 139:7-25, 140:8-25, 141:1-25, Ex. 30.) On May 2, 2014, CHP approved the consult with Denver Health. (*Id.* at 140:2-7, Ex. 30.) On May 28, 2014, Plaintiff was seen by medical providers at Denver Health. (*Id.* at 142:14-22,

9

Ex. 31.) During this visit, Plaintiff informed the provider he did not want to proceed with a total colectomy and, instead, preferred a segmented colectomy. (*Id.* at 143:14-23, Ex. 31.) The Denver Health provider offered to schedule a segmented colectomy instead of a total colectomy. (*Id.* at 143:24-25, 144:1-3, Ex. 31.) Plaintiff, instead, requested they proceed with a colonoscopy in lieu of surgery to see what was in the remainder of his colon to "obviate the need for two surgeries." (*Id.* at 144:4-25, 145:1-7, Ex. 31.) Thus, the Denver Health provider postponed surgical intervention and ordered a pediatric colonoscopy. (*Id.* at 145:12-19, Ex. 31.) On June 2, 2014, Denver Health requested CHP approve a pediatric colonoscopy for Plaintiff. (*Id.* at 147:23-25, 148:1-16, Ex. 32.) CHP approved the pediatric colonoscopy on June 12, 2014. (*Id.* at 148:17-19, Ex. 32.)

On July 8, 2014, Plaintiff fell ill and was transported to the hospital and was eventually transported to Denver Health and admitted on or about July 9, 2014. (*Id.* at 148:22-25, 149:1-25, 150:1-12, Ex. 33.) Plaintiff was diagnosed with "a partial small bowel obstruction secondary to colonic stricture," and a procedure was scheduled for July 16, 2014, in which Plaintiff would receive an "elective partial colectomy through surgery." (*Id.* at 150:13-16, 151:8-11, Ex. 33.) On July 14, 2014, Denver Health requested CHP's approval to perform the partial colectomy on Plaintiff. (*Id.* at 152:7-25, 153:1-12, Ex. 34.) The partial colectomy procedure was approved. (*Id.* at 153:13-17, Ex. 34.) On July 17, 2014, Plaintiff received a successful partial colectomy in which the stricture and the unhealthy segment of Plaintiff's colon was removed and the remainder of the colon was reattached, which was the surgical procedure Plaintiff was hoping would be successful. (*Id.* at 156:17-25, 157:1-25, 158:1-12, Ex. 36.) After the successful

surgery, Plaintiff recovered and has remained without significant issue since the operation. (*Id.* at 162:2-25, 163:1-25, 164:1-4, Ex. 38.)

## STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. Moreover, because

Plaintiff is proceeding *pro se*, the court, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding allegations of a *pro se* complaint "to less stringent standards than formal pleadings drafted by lawyers"). At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

**ANALYSIS**

*1.     Deliberate Indifference Claim*

Plaintiff alleges the CHP's denials of the colonoscopy requested March 25, 2013, and the "laparoscopic possible open total abdominal colectomy with J pouch anastomosis and protective ileostomy" requested May 28, 2013 violated his Eighth Amendment rights.

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend VIII. As such, it requires that "prison officials . . . ensure that inmates receive adequate food, clothing, shelter, and medical care, and [that they] must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted). The court's analysis of Plaintiff's Eighth Amendment claims involves both an objective and subjective component. *Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991).

As to the objective component, the court considers whether Plaintiff has been deprived of a sufficiently serious basic human need. "[A] medical need is considered 'sufficiently serious' if the condition 'has been diagnosed by a physician as mandating treatment . . . or is so obvious that even a lay person would easily recommend the necessity for a doctor's attention.'" *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 2001)). Where a prisoner claims that harm was caused by a delay in medical treatment, he must "show that the delay resulted in substantial harm" in order to satisfy the objective prong of the deliberate indifference test. *Oxendine*, 241 F.3d at 1276. "The substantial harm the substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* at 1278.

As to the subjective component of a deliberate indifference claim, the plaintiff must prove that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health and safety." *Farmer*, 511 U.S. at 837. That is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

### A. *Objective Component*

Defendant argues there is no evidence that denials of the colonoscopy or surgery on Plaintiff's colon constitute denials of sufficiently serious medical needs sufficing the objective prong of the deliberate indifference test.

The undisputed evidence shows that, though the Denver Health medical provider intended to use the colonoscopy to evaluate potential surgical options (Mandrell Dep. at 102:14-21, Ex. 20), the denial of the colonoscopy proved to be inconsequential, as Denver Health

13

decided to move forward with surgery as of May 22, 2013, without requiring the colonoscopy be performed (*id.* at 112:18-25, 113:1-6, 114:17-25, 115:1-18, Ex. 23). Moreover, the Plaintiff's medical provider labeled the colonoscopy request "routine." (Mandrell Dep., Ex. 22.) According to the records, another "routine" request for a colonoscopy was not submitted until November 5, 2013. (*Id.*, Ex. 29.) Plaintiff has failed to show that the denial of the colonoscopy request constituted a sufficiently serious medical need mandating treatment. *Oxendine*, 241 F.3d at 1276.

As to the denied request for surgery, the undisputed evidence shows that Plaintiff's medical providers labeled the procedures "routine." (Mandrell Dep., Ex. 24; Resp. 16.) Once CHP discovered it had been provided with the wrong date for Plaintiff's MRD by the CDOC, it reversed the denial and approved Plaintiff's surgery. (Mix Decl., ¶ 15, Attach. 3.) By September 24, 2013, at the latest, both Denver Health and the CDOC were aware of the reversal and that the surgical request was approved. (*Id.*) Defendant argues Plaintiff cannot demonstrate this brief delay, from May 28, 2013, when the request was submitted, to September 24, 2013, resulted in substantial harm.[1] (Mot. at 15.) The undisputed evidence shows that, as of May 22, 2013, Plaintiff had been experiencing the same symptoms for nearly a year, including some abdominal pain, periodic diarrhea, and coffee ground stools every three to four days. (Mandrell Dep. at 116:11-25, 117:1-8, Ex. 23.) As of November 2013, nearly six months after the request, Plaintiff

---

[1] Defendant argues that "Plaintiff has not endorsed any expert witnesses to opine the alleged delay caused significant harm, as required by law, *Mata*, 427 F.3d at 754-55." (Mot. at 15.) *Mata* does not state that a plaintiff is required to present expert testimony, but rather than in that specific case the plaintiff had submitted expert evidence. *Id.* at 754. If a *pro se* prisoner plaintiff were required to submit expert testimony to defeat summary judgment, virtually every *pro se* prisoner plaintiff would lose at the summary judgment stage due to a general lack of resources. Rather, to defeat summary judgment, a party must "demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518.

14

was "eating well," he did not have blood in his stools, and his symptoms were no worse than they had been a year prior. (Mandrell Dep. at 138:1-6, 138:22-25, 139:1-4, Ex. 29.)

Moreover, even after the denial had been reversed, Plaintiff specifically requested the medical providers delay surgery in May 2014 to perform additional tests and evaluate Plaintiff's condition. (*Id.* at 144:4-25, 145:1-7, Ex. 31.) On July 17, 2014, Plaintiff received a successful partial colectomy (*id.*, Ex. 36), and Plaintiff has remained without significant issue since the operation (*id.* at 162:2-25, 163:1-25, 164:1-4, Ex. 38; *see also* Compl. at 8 ["As of now I am no longer experiencing any symptoms and am feeling better!"]).

Plaintiff has failed to show that he suffered from any substantial harm such as a "lifelong handicap, permanent loss, or considerable pain." *Oxendine*, 241 F.3d at 1278. As such, Plaintiff has failed to satisfy the objective component of a deliberate indifference claim.

### B. *Subjective Component*

Defendant argues that "the denial [of the colonoscopy] amounted to nothing more than a disagreement over the treatment plan." (Mot. at 14 [citing *Wingfield v. Robinson*, No. 10-cv-01375-REB-KLM, 2011 WL 5172567, at *4 (D. Colo. Aug. 10, 2011)].) Defendant also argues that the denial of the surgery is "is indicative of a disagreement among physicians regarding Plaintiff's treatment plan, which is not a constitutional violation. (*Id.* at 15 [citing *Wingfield*, 2011 WL 5172567, at *4].) While it is true that "an inmate's difference of opinion concerning the medical treatment that he received or did not receive does not generally support a claim for cruel and unusual punishment," *id.*, at *4 (citing *Olsen v. Stotts*, 9 F.3d 1475, 1477 (10th Cir. 1993)), Plaintiff does not base his deliberate indifference claim on his own opinion that he should have received a colonoscopy or surgery. Rather, if there was any disagreement as to the

course of care, the disagreement was between CHP and the physician who requested the colonoscopy and the surgery. This does not change the court's analysis, however.

The Tenth Circuit determined "a prison doctor remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment." *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006) (quoting *Snipes v. DeTella*, 95 F .3d 586, 591 (7th Cir. 1996)). Decisions such as a preferred course of treatment are based on medical judgment and are outside of the Eighth Amendment's scope. *Id.* (citing cases). Plaintiff must show "deliberate refusal to provide medical attention, as opposed to a particular course of treatment." *Fleming v. Uphoff*, 210 F.3d 389, 2000 WL 374295, at *2 (10th Cir. April 12, 2000) (quoting *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir.1997)). The Supreme Court concluded "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." *Estelle*, 429 U.S. at 107. Such difference of opinion may amount to medical malpractice which is not actionable under § 1983. *Braxton v. Wyandotte County Sheriff's Dep't*, 206 F. App'x 791, 793 (10th Cir. 2006) (citing *Kikumura*, 461 F.3d at 1291).

Here, the undisputed evidence shows that Plaintiff was not denied *all* medical care, but rather that he was denied only the colonoscopy that was recommended on March 25, 2013, and the surgery that was recommended on May 28, 2013. Moreover, the decisions to delay the colonoscopy and the surgery were based not only on the information that CHP had at that time regarding Plaintiff's MRD, but also, as to the colonoscopy, based on previous pathology results (Mandrell Dep. at 108:9-25, 109:1-21, Ex. 22; *see also* Mix Decl., ¶ 12; Resp. at 12-13) and

based on the opinion that on the surgery could be safely deferred until after Plaintiff's release (Mandrell Dep. at 120:1-9, Ex. 24; *see also* Mix Decl. at ¶ 14; Resp. at 16). These decisions about the preferred course of treatment are based on medical judgment and are outside of the Eighth Amendment's scope. *Callahan*, 471 F.3d at 1160 (citing cases).

Thus, Plaintiff also has failed to satisfy the subjective prong of an Eighth Amendment deliberate indifference claim.

**WHEREFORE**, for the foregoing reasons, it is

**ORDERED** that "Defendant's Motion for Summary Judgment" (Doc. No. 77) is **GRANTED**. This case is dismissed in its entirety.

Dated this 20th day of April, 2017.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge